GAMBLE v. CLEVELAND CLIFFS IRON CO.

(Circuit Court of Appeals, Sixth Circuit. January 8, 1908.)

No. 1,710.

1. BROKERS—CONTRACT FOR COMMISSIONS—EVIDENCE—QUESTION FOR JURY.

In an action by a broker to recover commissions on a sale of timber land, evidence *held* to require submission of the question as to the existence of the contract to pay for his services to the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Brokers, §§ 128, 129.]

2. CORPORATIONS—REPRESENTATIONS BY AGENT.

Plaintiff offered certain timber lands to defendant at a certain price per acre net to the owner, plaintiff's commission to be 5 per cent. Defendant's president referred plaintiff's letter to R., who was defendant's land agent, and he refused plaintiff's offer at the price specified, but continued negotiations with him, and later a sale was consummated between the owner of the land and defendant's president. *Held*, that plaintiff was authorized to assume that R. had authority to contract with plaintiff to pay a commission in case of the consummation of the sale.

3. BROKERS—COMPENSATION—REVOCATION OF AUTHORITY.

The owner of certain timber land authorized plaintiff to offer the same for sale at $2.75 per acre net. After plaintiff had offered the land to defendant, the owner's superintendent wrote defendant that they had decided to keep the lands out of the market until they had made a thorough examination of the lands, and, when that was finished, they would be glad to name defendant a price. Thereafter the matter was again taken up by a letter of one of the owner's officers to defendant's president, and subsequent negotiations resulted in a sale. *Held*, that the owner's letter withdrawing the lands from the market was but a temporary withdrawal for the purpose of examination only, and was not effective to deprive plaintiff of the right to commissions.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Brokers, § 45.]

4. SAME—COMMISSIONS ON ADDITIONAL LAND.

Where the owner of certain timber land empowered plaintiff to sell the same at a specified price net, and gave plaintiff a plat of the land he was authorized to sell, plaintiff could not claim commissions on a sale of additional land not included in such plat.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

George Weadock, for plaintiff in error.

Wm. P. Belden, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This suit was brought to recover the sum of $8,264.05, being a commission of 5 per cent. on $165,282.07, the purchase price paid by the Cleveland Cliffs Iron Company to the Manistique Lumber Company for a tract of timber land in the Upper Peninsula of Michigan. At the conclusion of the testimony, upon motion, the court directed a verdict for the defendant. This action is assigned as error. In order to determine whether the court was right in thus withdrawing the case from the jury, it will be necessary to go into the facts. The court necessarily held that, upon the undisputed facts, there was no case in favor of the plaintiff; either that there was no contract for a commission on the sale made, or no sale made which

under the alleged contract entitled the plaintiff to a commission, or both. The two companies interested in the transactions in suit were the Cleveland Cliffs Iron Company and the Manistique Lumber Company. The former company was engaged in the mining, manufacturing, timber, and lumber business, the latter, for the most part, in the timber and lumber business. They operated in Michigan and adjoining states. Samuel Redfern was the land agent of the Cleveland Cliffs Iron Company, with an office at Negaunee, Mich., while John Millen, of Duluth, Minn., was the manager of the Manistique Lumber Company. William G. Mather was the president of the Cleveland Cliffs Iron Company, with an office in Cleveland, Ohio, while Alger, Smith & Co., of Detroit, were largely interested in the Manistique Lumber Company, Gen. Alger being the president. Henry Gamble, the plaintiff, lived in Grand Marais, Mich., and for some 35 years had been engaged, off and on, in the lumber business, buying and selling timber lands on commission. He was acquainted with the timber lands of the Manistique Lumber Company in the counties of Luce, Alger, and Schoolcraft, in the Upper Peninsula of Michigan, which aggregated about 60,000 acres, of which 30,000 acres were hardwood lands. In September, 1900, the plaintiff had a conversation with John Millen, the general manager of the Manistique Company, in which the latter gave him authority to offer the entire tract of timber land owned by that company for $2.75 per acre net to the company. Gamble told Millen he thought he could sell the land to the Cleveland Cliffs Iron Company, and under the direction of Millen a plat of the land was made and given to Gamble on September 23, 1900. Gamble wrote from Grand Marais to the Cleveland Cliffs Iron Company, inquiring:

"Are you in the market for a tract of hardwood lands, about thirty thousand acres, adjoining and lying east of your recent purchase at Munising? If so let me hear from you."

On September 27, 1900, William G. Mather, the president of the defendant company, answered, acknowledging receipt of this letter, and saying that he had referred the same to "our Mr. Samuel Redfern, of Negaunee, Michigan, who will take the matter up with you, if it seems worth while." On October 4, 1900, Redfern wrote Gamble, stating the latter's letter of the 23d of September had been referred to him, and he would like to be informed of full particulars regarding this tract of 30,000 acres of hardwood lands east of Munising. On October 8, 1900, in answer to this letter, Gamble wrote Redfern, describing the location of the land, offering to send a plat if desired, and saying:

"It is considered a very good tract of hardwood, as good as there is in this part of the country. Some of it is better than others. The property is placed in my hands for sale at the price of $2.75 per acre, net to the owner. My commission will be 5 per cent."

On October 17, 1900, Redfern wrote Gamble, saying:

"In reference to your offer of thirty thousand acre tract of land southwest of Grand Marais, as far as we can understand the location, will say we do not care to entertain an offer at any such price."

After receiving the last letter and obtaining a plat of the Manistique lands from Millen, Gamble proceeded to Negaunee, Mich. There he

met and had a conversation with Redfern. This talk is described by the participants and also by George C. Brown, who heard part of it and who seems to be a disinterested witness. Gamble testified:

"I introduced myself to Mr. Redfern, and told him that I had brought up the plat of that land I had written about, and I explained the matter to him. I explained that there was between 55,000 and 60,000 acres altogether on the plat, and a part of it was spruce, cedar, balsam, and hemlock, and they considered they had about 30,000 acres of hardwood. I said, 'I will tell you who owns the land.' In regard to the price I said: 'The price the owners gave me was $2.75 per acre. Now, I will tell you who owns the land. The lands are owned by John Millen, of Duluth, and Alger, Smith & Co., of Detroit, who compose the Manistique Lumber Company. You can have all your correspondence direct with them; but, if you purchase the lands, you will have to pay my commission of 5 per cent. as I wrote you.' He said, 'If we purchase the lands, we will pay you the commission.' "

This statement was in no material respect changed on cross-examination. Brown testified that Gamble said:

"He would give them the man's name that owned this land. I just happened to hear that first. Then he went on, and said that Mr. Millen, of Duluth, and Alger, Smith & Co., of Detroit, was the firm of the Manistique Lumber Company and owners. That is what I heard him say first. He said, 'You can have all your own correspondence with these folks and make your own bargains or arrangements at the prices,' but he said, 'If you buy land, you will have to pay me my commission, 5 per cent. as I wrote to you.' He says, 'If we purchase the land, we will pay you 5 per cent. commission.' "

Redfern admits the conversation with Gamble in October, 1900. He states that Gamble presented a plat of the lands he was offering for sale, said it was a tract of generally good hardwood lands, but said some of them were not good. "He recommended that we should buy them, and referred me to John Millen, of Duluth, manager of the Manistique Lumber Company, and asked me to correspond with Mr. Millen about the land, and I told him I would have to refer the plat and the whole matter to Mr. Mather." Redfern says nothing was said by Gamble to him or by him to Gamble on the matter of a commission for his services, if the sale were made.

On November 10, 1900, Redfern wrote to Mather, the president of the company, inclosing the plat left him by Gamble, saying the latter had left a map which showed about 50,000 acres belonging to the Manistique Company, and "requests us to negotiate directly with the owners represented by Mr. Millen, their superintendent at Duluth, Minnesota, and that they will try to accommodate us as to price." On May 18, 1901, Redfern acting for the defendant company, wrote Millen, calling his attention to Gamble's offer of the preceding fall, asking to be informed of the price per acre, and stating, if it seemed to be a bargain for such a large purchase, they would give the matter their best consideration. In reply, Millen, as vice president of the Manistique Company, wrote Redfern on May 20, 1901, as follows:

"We are now looking over our hardwood lands in the vicinity of Grand Marais, and we have decided to keep them out of the market until we have a thorough examination made and know what we have on the lands. When that is finished, we will be very glad to name you price."

The record shows no resumption of the negotiations for the sale of the Manistique timber lands to the defendant company until the sum-

mer of 1902, when the presidents of these two companies, Mr. Mather and Gen. Alger, met at the laying of a cornerstone in Munising. Mr. Mather opened the resulting correspondence by a letter dated October 30, 1902, in which he called attention to the railroad and timber lands tributary to Grand Marais, and asked a proposition. It is unnecessary to go into the correspondence which ensued. There were provisions respecting the reservation of mineral rights, the cutting of certain timber, and the construction and use of certain railroads, which were agreed upon and inserted. The contract was really reached along in April, 1903, but executed the 1st of October of that year. By it 59,-174.79 acres of land in Michigan was sold by the Manistique Company to the Cleveland Cliffs Iron Company for $165,281.07. In reaching this result, a part of the land was classed as good land at $5 an acre, and the balance as bad land at 50 cents an acre. The entire tract was sold for about $2.79 an acre on an average. The price named by Millen to Gamble was $2.75 an acre net.

The above are substantially the facts in the case, or, as it is not necessary to take so strong a position, there is evidence in the record tending to prove these facts, and since there is evidence tending to prove them, if they make a case for the plaintiff, the court erred in directing a verdict for the defendant.

And, first, as to the existence of the contract. The defendant contends that no contract for a commission was made. Gamble swears there was, and Brown supports him. Redfern swears there was not. Undoubtedly the Manistique Company in September, 1900, had a large tract of timberland for sale near the recent purchase of the Cleveland Cliffs Iron Company, at Munising. Millen, general manager of that company, gave Gamble authority to sell the land for $2.75 per acre net to the company. Gamble told Millen he thought he could sell it to the Cleveland Cliffs Iron Company, and Millen had a plat of the land made and given him. Gamble opened the matter by writing the Cleveland Cliffs Iron Company, asking if it was in the market for a tract of hardwood lands of about 30,000 acres. Mather, the president of the company, acknowledged this letter, saying he had referred it to Redfern, of Negaunee, their land agent, and Redfern on October 4th wrote Gamble, asking for particulars. In answer, Gamble wrote Redfern, describing the location, offering to send a plat, stating the character of the timber, and then making this important statement:

"The property is placed in my hands for sale at the price of $2.75 per acre net to the owner. My commission will be five per cent."

Here was the plain disclosure of the terms on which Gamble's services could be used. The land was for sale at $2.75 per acre, net to the owner, and his commission would be 5 per cent. There was no concealment on Gamble's part of the commission he proposed to charge for his services. In answer to Gamble's letter of particulars, Redfern wrote, saying they did not care to entertain the offer "at any such price," and then Gamble went to Negaunee and had a conversation with Redfern. He took with him a plat of the land, which he gave to Redfern. He explained the amount of the land and the nature of the timber, named the price the owners had given him, $2.75 per acre

*net,* disclosed the owners, stated that the Cleveland Cliffs Iron Company could have all its correspondence direct with them, but added:

"But, if you purchase the land, you will have to pay my commission of 5 per cent. as I wrote you."

And, according to Gamble, and Brown who corroborates him, Redfern answered:

"If we purchase the lands, we will pay you the commission."

It seems to us there is nothing unreasonable about Gamble's story of this transaction. He was an old timber man, who knew the character of the land, and that the Cleveland Cliffs Iron Company needed it. He got the outside price from Millen, and, after opening negotiations by letter, went to Negaunee to see Redfern, the land agent of the Cleveland Cliffs Iron Company. Of course, he went there, perhaps not for the purpose of immediately selling the land, but certainly of saying and doing whatever might judiciously lead to its ultimate sale. Before Gamble went to Negaunee, Redfern had written him, saying they did not care to entertain his offer, but Gamble took that statement cum grano salis, and went anyhow. Then he laid the matter fully before Redfern, gave him a plat of the land, told him the price, who the owners were, that his company could have all their correspondence direct with them, but reminded him that, if they purchased the land, they would have to pay his commission of 5 per cent. And Redfern accepted these terms. Now, we see nothing strange or unusual about this commission contract. Millen gave Gamble a price on the land, and Gamble brought the two parties to the subsequent purchase, the Manistique Company and the Cleveland Cliffs Iron Company, together. He could do nothing more. He was restricted as to the price, and it was wise to let the parties negotiate with one another as to any conditions or limitations which either might deem advisable.

It is claimed that Redfern had no authority to make this contract, but the correspondence was opened with Mather, the president of the company. He referred Gamble to Redfern; and, since all the parties knew what the matter under negotiation was, certainly Gamble had a right to believe that Redfern had authority to make a contract respecting a commission which was not only an incidental but a necessary thing at the opening of negotiations. Before Gamble went to Negaunee on October 8th, he wrote Redfern describing the land, stating it was placed in his hands for sale at the price of $2.75 per acre, net to the owners, and said his commission would be 5 per cent. This statement was not only in Redfern's hands, but must have been in Mather's, before Gamble and Redfern met on October 19th, so that the jury might fairly assume that Redfern's negotiations were authorized by Mather upon the commission basis laid down by Gamble at the start.

But it is said these lands were withdrawn by Millen, superintendent of the Manistique Company, by his letter of May 20, 1901. This letter was susceptible of a different construction. All it says is:

"We have decided to keep them [the hardwood lands] out of the market until we have a thorough examination made and know what we have on the lands."

This is only a temporary withdrawal for the purpose of examination. The letter goes on to say:

"When that is finished, we will be very glad to name you price."

So, it is clear, the so-called withdrawal was only for the purpose of more effectually preparing to negotiate. This conclusion is supported by the letter of Gen. Alger to Mr. Mather, on December 23, 1902, in which he says:

"Our superintendent, John Millen, is from Duluth and brings for our consideration the purchase of your 30,000 acres of hardwood lands in the Northern Peninsula."

This letter clearly ties the two so-called separate negotiations together, and shows that the negotiations begun with Millen at the suggestion of Gamble were carried on with Gen. Alger to whom Millen evidently reported. The negotiations between Alger and Mather were not separate and distinct from those started by Gamble. They were the natural outcome of what had happened before. By the summer of 1902 both companies had examined and considered the matter, and had naturally reached the point where they were ready to negotiate finally through their presidents.

It is said that the land sold to the Cleveland Cliffs Iron Company by the Manistique Company was not that described in the plat given Gamble by Millen. It may be that some land may have been included in that sale which was not covered by the original plat; but the sale was the sale by the Manistique Company of the land intended to be covered by that plat. The land offered by Gamble to Millen was the same land afterwards sold, for which he was to receive a commission of 5 per cent. It may be true additional land was sold. A trial will disclose that fact, and, if any such was sold, Gamble will not be entitled to commission on it. One of the questions for the jury to determine is the amount of the land sold which was covered by the original authority given Gamble.

In discussing the questions of fact which have suggested themselves to us, we are not to be taken as expressing our opinion about such questions one way or the other. We have gone far enough to reach the conclusion that the questions of fact involved in this case were of such doubtful solution as to require the verdict of a jury to decide them, and all our expressions of apparent opinion are to be limited by that end which we have held in view continuously.

The judgment is reversed, and the case remanded for a new trial.